# EXHIBIT "B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
 )          CDC Number J-43369
 )
CLIFFORD PARKER )          **INMATE**
 )
 )          **COPY**
---------------------------- )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 8, 2006

1:51 P.M.

PANEL PRESENT:

Mr. Thomas Sawyer, Presiding Commissioner
Ms. Suzanne Rothlisberger, Deputy Commissioner

OTHERS PRESENT:
Mr. Clifford Parker, Inmate
Ms. Mary Ann Tardiff, Attorney for Inmate
Mr. Jack Waddell, Deputy District Attorney,
Contra Costa County (Video)
Two Correctional Officers, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum

J. Farncomb          **Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 15 |
| Post-Commitment Factors | 35 |
| Parole Plans | 21 |
| Closing Statements | 54 |
| Recess | 67 |
| Decision | 68 |
| Adjournment | 76 |
| Transcriber Certification | 77 |

--oOo--

1

1          P R O C E E D I N G S

2          **PRESIDING COMMISSIONER SAWYER:** This is a

3   Subsequent Parole Consideration Hearing for

4   Clifford Parker, P-A-R-K-E-R, CDC number J, as

5   in John, 43369. Today's date is June 8, 2006,

6   and it's 1:51 in the afternoon. We are located

7   at the Correctional Training Facility in

8   Soledad. The date the inmate was received is

9   12/16/1994, from the County of Contra Costa.

10  The offense was kidnap, robbery, Case Number

11  9324220; count-number two: 209(b) of the Penal

12  Code. The term is seven to life. The minimum

13  eligible parole date is 5/5/1998. This Hearing

14  is being tape-recorded and for the purpose of

15  voice identification each of us is required to

16  state our first and last name. When it comes to

17  your turn if you would also give us your CDC

18  number. I'll start and go to my left, Tom

19  Sawyer, S-A-W-Y-E-R, Commissioner.

20          **DEPUTY COMMISSIONER ROTHLISBERGER:**

21  Suzanne Rothlisberger,

22  R-O-T-H-L-I-S-B-E-R-G-E-R, Deputy Commissioner.

23          **DEPUTY DISTRICT ATTORNEY WADDELL:** My

24  name is Jack Waddell, W-A-D-D-E-L-L, Deputy

25  District Attorney of Contra Costa County.

26          **ATTORNEY TARDIFF:** Mary Ann Tardiff

27  T-A-R-D-I-F-F, attorney for Mr. Parker.

2

1       **INMATE PARKER:**  Clifford (indiscernible)
2   Parker, P-A-R-K-E-R, J-43369.

3       **PRESIDING COMMISSIONER SAWYER:**  Thank
4   you.   Let the record reflect that Mr. Waddell is
5   coming to us via videoconference.  We also have
6   two correctional peace officers in the room for
7   security purposes.  Mr. Parker, the record
8   reflects that you signed a BPT form 1073, which
9   is the Reasonable Accommodation Notice And
10  Request in Accordance With The Provisions of the
11  Americans With Disabilities Act, and this was
12  signed on 9/15/05, and you indicate, you don't
13  indicate anything on here.  We would like for
14  you indicate whether you need any help for your
15  Hearing or not.  There's a box, there's boxes on
16  there, if you take a look at that.

17      **ATTORNEY TARDIFF:**  You don't need any?
18      **INMATE PARKER:**  No.

19      **PRESIDING COMMISSIONER SAWYER:**  Okay, let
20  the record reflect that Ms. Tardiff just check
21  the box and told him that he doesn't need
22  anything for his --

23      **ATTORNEY TARDIFF:**  Accommodating.

24      **PRESIDING COMMISSIONER SAWYER:**  --
25  accommodating.  And have you discussed this with
26  Mr. Parker?

27      **ATTORNEY TARDIFF:**  Yes.

3

1          PRESIDING COMMISSIONER SAWYER:   And

2    you've talked to him about the script for

3    accommodation, disabilities?

4          ATTORNEY TARDIFF:   I did.

5          PRESIDING COMMISSIONER SAWYER:   The

6    outline of the Hearing procedure?

7          ATTORNEY TARDIFF:   Yes.

8          PRESIDING COMMISSIONER SAWYER:   His

9    rights?

10          ATTORNEY TARDIFF:   Uh huh.

11          PRESIDING COMMISSIONER SAWYER:   And the

12    confidential material?

13          ATTORNEY TARDIFF:   Yes.

14          PRESIDING COMMISSIONER SAWYER:   Okay,

15    would you waive reading those scripts?

16          ATTORNEY TARDIFF:   I do.

17          PRESIDING COMMISSIONER SAWYER:   I'll mark

18    that Exhibit One, thank you.   Commissioner

19    Rothlisberger, is there any confidential

20    material that will be used in this Hearing?

21          DEPUTY COMMISSIONER ROTHLISBERGER:   Not

22    that will be used.

23          PRESIDING COMMISSIONER SAWYER:   Okay.

24    Mr. Waddell, did you receive a psychiatric

25    report?

26          DEPUTY DISTRICT ATTORNEY WADDELL:   Yes, I

27    did.

4

1        PRESIDING COMMISSIONER SAWYER:  Okay, the
2   latest should be the May of 2006.

3        DEPUTY DISTRICT ATTORNEY WADDELL:  Right.
4        PRESIDING COMMISSIONER SAWYER:  Okay.
5        DEPUTY DISTRICT ATTORNEY WADDELL:  I got
6   that by fax.

7        PRESIDING COMMISSIONER SAWYER:  Okay,
8   very good.  That's the only change that I'm
9   going to make on Exhibit Two, which is the
10  Hearing checklist.  I'm going to hand this over
11  to Ms. Tardiff, and if you could check yours,
12  Mr. Waddell, against your documents.  And I did
13  check in there that we did receive a new
14  psychiatric report.

15       DEPUTY DISTRICT ATTORNEY WADDELL:  Yes,
16  it would appear that everything is there that is
17  dated on the list of 5/12/06.

18       PRESIDING COMMISSIONER SAWYER:  Thank
19  you.

20       DEPUTY DISTRICT ATTORNEY WADDELL:  Plus
21  the new psych.

22       ATTORNEY TARDIFF:  I have those documents
23  as well.  Everything else has been submitted and
24  we are ready to proceed without any objections.

25       PRESIDING COMMISSIONER SAWYER:  Okay,
26  thank you.  And for the record I have a -- how
27  many pages is this, Mr. Parker?

5

1        **ATTORNEY TARDIFF:**  Seventy is what --
2        **INMATE PARKER:**  Close to 70.  Most of the
3   exhibits are just chronos and psych report and
4   letters, support letters and stuff of that
5   nature.

6        **PRESIDING COMMISSIONER SAWYER:**  Okay,
7   because I noticed that there wasn't any letters
8   in your file, in our Board Report, but there are
9   five letters in here.

10       **INMATE PARKER:**  Right.

11       **PRESIDING COMMISSIONER SAWYER:**  So I'll
12  have to get them out of there when I get to that
13  part.

14       **INMATE PARKER:**  Okay.

15       **PRESIDING COMMISSIONER SAWYER:**  Okay.

16       **DEPUTY COMMISSIONER ROTHLISBERGER:**  Oh, I
17  take it back, there is some confidential -- one
18  thing that I do want -- that it's a victim
19  letter, a VNOC letter.

20       **DEPUTY DISTRICT ATTORNEY WADDELL:**  I
21  should note that we did not get copies of that
22  70 page proposal of the inmate; however, I did
23  see a reference to it and I trust that anything
24  that is particularly relevant, particularly with
25  regard to the living arrangements and the job
26  opportunities will be identified and discussed
27  by the Board.

6

1        **PRESIDING COMMISSIONER SAWYER:**  It will,

2   Mr. Waddell, thank you.  I think originally you

3   were planning on being here?

4        **DEPUTY DISTRICT ATTORNEY WADDELL:**  Yes.

5        **PRESIDING COMMISSIONER SAWYER:**  Yeah.

6   And there was a last minute change and that's

7   why you're on video.

8        **ATTORNEY TARDIFF:**  Basically the material

9   in the submitted document is in your file, for

10  the most part, it's just chronos, basically it's

11  institutional programming.

12       **PRESIDING COMMISSIONER SAWYER:**  Okay.

13  Okay, this is a confidential letter written to

14  us from the victim's family, and we will let you

15  know if we use it in the Hearing.  If we do

16  we'll have to use it during the recess.  Will

17  the inmate be speaking with the Panel, counsel?

18       **ATTORNEY TARDIFF:**  Yes, he will.

19       **PRESIDING COMMISSIONER SAWYER:**  Okay,

20  about the commitment offense?

21       **ATTORNEY TARDIFF:**  Yes.

22       **PRESIDING COMMISSIONER SAWYER:**  Thank

23  you.  Would you raise your right hand,

24  Mr. Parker?  Do you solemnly swear or affirm

25  that the testimony you give at this Hearing will

26  be the truth, the whole truth and nothing but

27  the truth?

7

1    **INMATE PARKER:** Yes, sir.

2    **PRESIDING COMMISSIONER SAWYER:** Thank

3    you.  I'm going to be reading from the

4    September '04 Board Report.  We do have a

5    November '05 report but it refers back to it in

6    the area of the commitment offense.  This is

7    page one, Summary of the Crime.

8        Inmate Parker and victim Walter

9        Wainwright [phonetic] were

10        civilian employees of the Navy at

11        the Alameda Naval Air Station.

12        They worked as suppliers for a

13        vending machine company.  On

14        July 14, 1992, the victim's

15        supervisor became concerned when

16        the victim did not return to work

17        at 10:30 or 11:00 A.M. to make his

18        scheduled cash drop.  He was last

19        seen at 10:30 A.M. that morning by

20        one of his fellow employees.  It

21        was estimated that he had

22        appropriately $4,000 in his

23        possession.  Contra Costa

24        Sheriff's officers received a

25        complaint that at appropriately

26        4:30 P.M. on July 14, 1992, a man

27        with tape on his mouth and bound

8

1    hands was locked in the truck of a
2    1977 Ford Maverick.  Witnesses
3    indicated that they saw the
4    vehicle enter the apartment
5    complex on Crestwood [phonetic].
6    When the first saw the vehicle
7    there were three occupants in the
8    car.  A maintenance man observed
9    the victim in the truck of the
10   car.  He had his mouth duct taped
11   and his right arm appeared to be
12   bound behind his back.  His left
13   arm was free and he was terror-
14   stricken.  Before the maintenance
15   man could go to the victim aid,
16   Parker ran out of the apartment
17   and slammed the truck on the
18   victim's head.  He and one other
19   person then drove off.  Other
20   witnesses saw Parker and another
21   person, described as Hispanic man,
22   taking blankets, boxes and money
23   bags out of the apartment and
24   putting them in the car.  The car
25   was identified as belonging to
26   Parker and it was found that he
27   was a residence of the apartment

9

| | |
|---|---|
| 1 | from which he was seen carrying |
| 2 | various articles.  Sheriff's |
| 3 | Department eventually found that |
| 4 | Parker was an employee of the |
| 5 | Federal government in Alameda.  On |
| 6 | July 15, 1992, the connection |
| 7 | between Parker and the victim was |
| 8 | made and he was arrested on this |
| 9 | date.  Initially Parker indicated |
| 10 | that the whole situation was a |
| 11 | joke and apologized for any |
| 12 | inconvenience.  He claimed that |
| 13 | he, his brother Lamar, L-A-M-A-R, |
| 14 | and Frank Wilson, W-I-L-S-O-N, |
| 15 | crime partners, had gotten drunk |
| 16 | with a guy known to him as John. |
| 17 | He claimed that a bet was made on |
| 18 | how quickly John could get out of |
| 19 | the truck of Parker's car.  On |
| 20 | July 17, 1992, Frank Wilson was |
| 21 | arrested and stated that the |
| 22 | victim had been kidnapped and was |
| 23 | originally the result of botched |
| 24 | robbery attempt by himself, Parker |
| 25 | and Parker's brother Lamar.  He |
| 26 | states that he and Lamar abducted |
| 27 | the victim in Oakland, stripped |

10

1       the van of its safe and all the

2       monies, and transported the victim

3       to Fairfield in Parker's vehicle.

4       In the meantime Parker returned to

5       work at the Naval Air Station in

6       Alameda.  Frank Wilson and Lamar

7       Parker returned to Parker's

8       apartment in San Pablo where they

9       unloaded the bounty.  They then

10      went to the Naval Air Station with

11      the victim still secured in the

12      truck and picked up Parker from

13      work.  All three returned to the

14      apartment, and this is where the

15      victim nearly escaped.  It was at

16      that time that Parker came down

17      from the apartment and closed the

18      truck on the victim.  At this

19      point Frank Wilson did not want

20      anything to do with them.  Parker

21      claimed that he and Lamar went to

22      Wilson's house in order to get

23      Wilson to help them with the

24      victim, but couldn't find Wilson.

25      At this point they rented a motel

26      room in Berkeley.  Parker claims

27      that they walked the victim into

11

```
 1          the room and he was lying on the
 2          floor with the duct tape still on   .
 3          him.  Reports indicate that the
 4          victim was never found.
 5   Tell us about this, Mr. Parker?
 6          INMATE PARKER:  Well that is accurate and
 7   true.
 8          PRESIDING COMMISSIONER SAWYER:  That's
 9   accurate and true?
10          INMATE PARKER:  Yes, it is.
11          PRESIDING COMMISSIONER SAWYER:  Okay, the
12   burning question and I'm sure that you've been
13   asked this before is:  Where is the victim?
14          INMATE PARKER:  Right.  Well, at the time
15   I was arrested the victim was with my brother at
16   the motel.  He hasn't been found and I tried to
17   talk to my brother through family about where
18   the victim is to possibly give the victim's
19   family closure, Walter's family closure, and I
20   haven't got any news from anyone.
21          PRESIDING COMMISSIONER SAWYER:  Okay, so
22   did you guys plan to rob Mr. Wainwright?   .
23          INMATE PARKER:  Yes.
24          PRESIDING COMMISSIONER SAWYER:  And how
25   old was Mr. Wainwright?  Do you remember?
26          INMATE PARKER:  He was in his early 30s,
27   34. .
```

12

1          PRESIDING COMMISSIONER SAWYER:  Thirty-

2     four, okay.  What did Mr. Wainwright say when

3     you robbed him?

4          INMATE PARKER:  Well, I wasn't present at

5     the time they robbed him, when they actually got

6     him; I saw him later.  Actually when my brother

7     told me to go shut the truck on him, that was

8     the first time I actually saw him.

9          PRESIDING COMMISSIONER SAWYER:  Uh huh.

10    And you went along with the whole plan?

11         INMATE PARKER:  Yes.

12         PRESIDING COMMISSIONER SAWYER:  And how

13    much money did you get for this?

14         INMATE PARKER:  I don't know I never --

15         PRESIDING COMMISSIONER SAWYER:  You never

16    saw the money?

17         INMATE PARKER:  No.

18         PRESIDING COMMISSIONER SAWYER:  And what

19    happened to your brother?

20         INMATE PARKER:  He got convicted of

21    murder with special circumstances and he was

22    sentenced to life without the possible of

23    parole.

24         PRESIDING COMMISSIONER SAWYER:  Okay, and

25    Mr. Wilson?

26         INMATE PARKER:  He got immunity for

27    testifying and he went home.

13

1    **PRESIDING COMMISSIONER SAWYER:**  Okay, and
2    was there ever a guy named John?
3    **INMATE PARKER:**  No.
4    **PRESIDING COMMISSIONER SAWYER:**  And why
5    did you lie about this situation when you got
6    arrested?
7    **INMATE PARKER:**  Well, back then at the
8    time when all this occurred I was going through
9    a breakup with my girlfriend at the time, and my
10   brother, I always looked up to him at that
11   point.  He had a prior history of being in
12   trouble and in and out of prison his whole life.
13   And I kind of looked up to him, and he kind of
14   influenced me, you know.  I had never
15   experienced nothing like that because I'd never
16   been in trouble.  I just went along with the
17   things that he told me to do.  Do get me wrong,
18   I'm not trying to say that I blame him for what
19   I've done.  I made a conscience decision to go
20   along with it.  But then I just allowed him to
21   influence me.  There's no excuse for it, you
22   know, I mean that I feel a lot of empathy for
23   Walter's family.  It's been rough, you know, but
24   I know that I've done a lot to change from that
25   person that I was then.
26       **PRESIDING COMMISSIONER SAWYER:**  Where do
27   think Mr. Wainwright is?

14

1        INMATE PARKER:  I know he's deceased.

2        PRESIDING COMMISSIONER SAWYER:  You know

3  he's deceased.

4        INMATE PARKER:  Sure, he has to be.  No

5  one has saw him since the incident occurred.

6        PRESIDING COMMISSIONER SAWYER:  Since

7  1992.

8        INMATE PARKER:  Right.

9        PRESIDING COMMISSIONER SAWYER:  July 14,

10  15th.

11        INMATE PARKER:  My brother is convicted

12  of murder.  And I tried, like I said, I tried to

13  talk to family members to talk to him to try and

14  find the whereabouts of Wainwright, but he

15  doesn't want to talk to anybody, I mean he just

16  -- I'm not trying to say that he's the black

17  sheep of the family or anything, but you know

18  he's not a good apple.  You know he's been in

19  and out of the hole where he is now.  I tried to

20  talk to my mom and my sisters to talk to him and

21  said, you know, to somehow give this guy's

22  family closure, Walter's family closure.  But he

23  just won't say anything to anyone.

24        PRESIDING COMMISSIONER SAWYER:  Do you

25  think the family is upset?

26        INMATE PARKER:  Very much so.

27        PRESIDING COMMISSIONER SAWYER:  I just

15

1   read a letter that indicates that they're very

2   upset.

3        INMATE PARKER:  They should be upset.

4        PRESIDING COMMISSIONER SAWYER:  Anything

5   else you want to talk about in terms of this

6   crime?

7        INMATE PARKER:  No, I'll just answer any

8   questions that you might need to ask me.

9        PRESIDING COMMISSIONER SAWYER:  Were you

10  under the influence at all?

11       INMATE PARKER:  No.

12       PRESIDING COMMISSIONER SAWYER:  Were you

13  a drinker at the time or a drug user?

14       INMATE PARKER:  No, just a casual drinker

15  from time-to-time; not a drinker.

16       PRESIDING COMMISSIONER SAWYER:  How old

17  were you at the time?

18       INMATE PARKER:  Twenty-four going on 25.

19       PRESIDING COMMISSIONER SAWYER:  Do you

20  have any children?

21       INMATE PARKER:  No.

22       PRESIDING COMMISSIONER SAWYER:  Okay, it

23  says that you were the youngest of six children

24  born to the union of Mary Ann and Lamar Parker.

25       INMATE PARKER:  Yes, sir.

26       PRESIDING COMMISSIONER SAWYER:  You're

27  brother is named after your dad?

16

1          INMATE PARKER:  Yes.

2          PRESIDING COMMISSIONER SAWYER:  Okay.

3   Your parents currently reside in Richmond,

4   California.

5          INMATE PARKER:  Yes, sir.

6          PRESIDING COMMISSIONER SAWYER:  All of

7   your brothers and sisters live in the bay area

8   with the exception of your oldest brother who we

9   have talked about is current housed at -- is he

10  still up at Pelican Bay?

11         INMATE PARKER:  No, he's at Calipatria.

12         PRESIDING COMMISSIONER SAWYER:

13  Calipatria now.  And you have one sister who

14  lives in Stockton?

15         INMATE PARKER:  Yes.

16         PRESIDING COMMISSIONER SAWYER:  And how

17  do you pronounce her name?

18         INMATE PARKER:  Lanawa [phonetic].

19         PRESIDING COMMISSIONER SAWYER:  Lanawa.

20  Are you Hawaiian?

21         INMATE PARKER:  My mom's Hawaiian and my

22  dad's Caucasian.

23         PRESIDING COMMISSIONER SAWYER:  Okay.

24  Were you born in Hawaii?

25         INMATE PARKER:  No, I was born in

26  Oakland.

27         PRESIDING COMMISSIONER SAWYER:  Okay, in

17

1  1966?

2          INMATE PARKER:  Yes.

3          PRESIDING COMMISSIONER SAWYER:  You lived

4  in Oakland until '85 when you moved to San Diego

5  and lived with your brother Lamar.

6          INMATE PARKER:  Right.

7          PRESIDING COMMISSIONER SAWYER:  How old

8  is -- how much older is Lamar than you?

9          INMATE PARKER:  He was born in 1960, so

10 he would be --

11         PRESIDING COMMISSIONER SAWYER:  Six

12 years.

13         INMATE PARKER:  I'd say about six years.

14         PRESIDING COMMISSIONER SAWYER:  You

15 stayed in San Diego for six months and then

16 returned to Oakland and attended school in

17 Oakland until you dropped out in the tenth grade

18 in 1982.

19         INMATE PARKER:  Right.

20         PRESIDING COMMISSIONER SAWYER:  Why did

21 you drop out of school?

22         INMATE PARKER:  Started working.

23         PRESIDING COMMISSIONER SAWYER:  Because

24 you knew everything that they were going to

25 teach you anyway?

26         INMATE PARKER:  Well, no not really.

27 I've learned a lot --

18

1          PRESIDING COMMISSIONER SAWYER:  Did you

2     have --

3          INMATE PARKER:  In prison I've leaned a

4     lot.

5          PRESIDING COMMISSIONER SAWYER:  Yeah.  It

6     seems like the older we get the more we learn.

7          INMATE PARKER:  Uh huh.

8          PRESIDING COMMISSIONER SAWYER:  While in

9     high school you began working at a fast food

10    restaurant and then began working part-time for

11    a design restaurant supply in Oakland.

12         INMATE PARKER:  Yes.

13         PRESIDING COMMISSIONER SAWYER:  "Began

14    working full time once he dropped out of high

15    school.  While in San Diego he worked for

16    H and R Associates Cabinet Makers on the

17    assembly line.  He returned to Oakland in the

18    late 1987 and met and moved in with his

19    girlfriend Kisha [phonetic] Hall."

20         INMATE PARKER:  Yes.

21         PRESIDING COMMISSIONER SAWYER:  In

22    Concord.  And this is the person that you were

23    breaking up with at the time of this commitment

24    offense?

25         INMATE PARKER:  Right.

26         PRESIDING COMMISSIONER SAWYER:  "They

27    never married and did not have any children.  He

19

1   was a temporary doc worker at the shipment

2   freight.  In 1988 Parker began working for the

3   Alameda Naval Air Station until his arrest in

4   July of 1992."  How long had you worked with

5   Mr. Wainwright?

6        INMATE PARKER:  Well, since I started

7   working there; the first time I started working

8   there in '88.

9        PRESIDING COMMISSIONER SAWYER:  In '88.

10  So you had known him for four years?

11       INMATE PARKER:  Well, off an on.  I mean

12  we worked in the same department but we had

13  different routes.

14       PRESIDING COMMISSIONER SAWYER:  I see.

15       INMATE PARKER:  But I knew him.  He was a

16  nice guy.

17       PRESIDING COMMISSIONER SAWYER:  Well,

18  then why did you kidnap him?

19       INMATE PARKER:  Well, that was based on

20  my brother -- well, he asked me a lot of

21  information about what was going on with our

22  routes, and I explained to him that Walter -- I

23  actually used to bring my brother to the Naval

24  Base.  He was kind of a really husky guy and he

25  used to work out and he asked me:  "well, who

26  fills up these machines here; the money

27  machines?"  And I tell him:  "Walter, a guy

20

1    named Wainwright."  And that's when about two

2    weeks later he said:  "Hey, I need to you take

3    me to work, we're going to do this.  Do you know

4    anybody?"  And he said let's talk to Frank, so

5    he brought Frank over and planned on doing this

6    and, you know, I told him I didn't want to be

7    there when they did it, but, you know, it was my

8    decision.  I made a conscience decision to go

9    along with it.

10        PRESIDING COMMISSIONER SAWYER:  Was that

11   your '77 Maverick?

12        INMATE PARKER:  Yes.

13        PRESIDING COMMISSIONER SAWYER:  It says

14   that you began smoking marijuana in junior high

15   school and continued it's use and denies the use

16   of any other drugs.  "He admits to having drank

17   Tequila for a short time when his relationship

18   with Kisha ended."  Is that right?

19        INMATE PARKER:  Yes.

20        PRESIDING COMMISSIONER SAWYER:  And for

21   the record, you don't have any juvenile or adult

22   convictions.

23        INMATE PARKER:  No.

24        PRESIDING COMMISSIONER SAWYER:  Have you

25   ever been arrested before for anything?

26        INMATE PARKER:  No.

27        PRESIDING COMMISSIONER SAWYER:  Okay, and

21

1    your future parole plans, you plan on, and this

2    is coming from the November 2005, and this is

3    where it indicates that you've submitted this

4    report that you, or this compilation of

5    information that you've given us today.  So

6    we'll start looking through this.  In this we

7    have activities and accomplishments from

8    November 2004 to 2006, and it's two pages, and

9    that's your copy.

10            **DEPUTY COMMISSIONER ROTHLISBERGER:**  Thank

11    you.

12            **PRESIDING COMMISSIONER SAWYER:**  There's

13    two copies of that, okay.  And then let's get

14    down to parole plans.

15            **INMATE PARKER:**  Page 12 and 13.

16            **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

17    apologize for being slow but this is -- we've

18    just received these before you came in.  Okay,

19    12 is institutional programming and 13 is parole

20    plans.  Right?

21            **INMATE PARKER:**  This is a more updated

22    one than it was (indiscernible).

23            **ATTORNEY TARDIFF:**  Oh, yeah.  We'll you

24    can clarify the update.  I gave him --

25            **INMATE PARKER:**  (indiscernible).

26            **ATTORNEY TARDIFF:**  Okay, I don't know

27    which one got the --

22

1        DEPUTY COMMISSIONER ROTHLISBERGER:  Here

2   do you want this one?

3        ATTORNEY TARDIFF:  Yeah, give him that

4   one.

5        PRESIDING COMMISSIONER SAWYER:  Is that

6   different than mine?

7        ATTORNEY TARDIFF:  A little bit.

8        DEPUTY COMMISSIONER ROTHLISBERGER:  Just

9   a little bit.

10       ATTORNEY TARDIFF:  He had to change it a

11  little bit.

12       DEPUTY COMMISSIONER ROTHLISBERGER:

13  That's fine.

14       PRESIDING COMMISSIONER SAWYER:  Okay.

15  Page 12, parole plans.  This is a timeline?

16       INMATE PARKER:  Yes.

17       PRESIDING COMMISSIONER SAWYER:  Is that

18  fair to say.  First one to 12 months I will

19  report to work at Rouse [phonetic] and Juarez

20  [phonetic] Trucking as a driver.

21       INMATE PARKER:  Yes, sir.

22       PRESIDING COMMISSIONER SAWYER:  And okay,

23  is there letters to back this up?

24       INMATE PARKER:  Yes.

25       PRESIDING COMMISSIONER SAWYER:  And where

26  are those letters?  In "D" [phonetic]?

27       DEPUTY COMMISSIONER ROTHLISBERGER:  There

23

1  in here.

2         INMATE PARKER:  Yes, sir.

3         DEPUTY COMMISSIONER ROTHLISBERGER:  I'll

4  also note that they are in the C-File also.

5         PRESIDING COMMISSIONER SAWYER:  Okay.

6  Okay, the letters, okay, here's Rouse and Juarez

7  Tucking.  A letter dated October 27, 2005, and

8  it says that they are in need of a reliable

9  worker who is drug free.  They currently have a

10  driving position open.  "Mr. Parker has kept us

11  updated as to his current status and we have

12  committed a position to him."  How do you know

13  Ms. Sonja [phonetic] Rouse?

14         INMATE PARKER:  Well, my fiancée --

15         PRESIDING COMMISSIONER SAWYER:  That's

16  your fiancée?

17         INMATE PARKER:  No.  It's a good friend

18  of hers.

19         PRESIDING COMMISSIONER SAWYER:  Oh.

20         INMATE PARKER:  They own the company.

21         PRESIDING COMMISSIONER SAWYER:  Okay, and

22  this is in Freemont, California.

23         INMATE PARKER:  Yes.

24         PRESIDING COMMISSIONER SAWYER:  Have you

25  ever driven a truck before?

26         INMATE PARKER:  Yes, I was a driver for

27  the Navy.

24

1          **PRESIDING COMMISSIONER SAWYER:**  Okay, and
2   then you got here you want to also work at
3   Lamar's [phonetic] Building Maintenance as a
4   helper.

5          **INMATE PARKER:**  Right.  That's my dad, he
6   works for the City, and I used to always help
7   him with maintenance work.

8          **PRESIDING COMMISSIONER SAWYER:**  Okay.

9          **INMATE PARKER:**  And that's a letter from
10  my mom.

11         **PRESIDING COMMISSIONER SAWYER:**  Okay,
12  let's not get ahead of ourselves here.  Let me
13  find, let me find this letter from your dad.  Do
14  you do have a letter from your dad?

15         **INMATE PARKER:**  No.  It's a letter from
16  my mom and it mentions it.  It's the first
17  letter right after --

18         **PRESIDING COMMISSIONER SAWYER:**  Oh, okay.
19  Okay, this is from Mary Ann Parker, dated
20  April 24, 2006, "I'm 64 years old and retired
21  from Oakland Unified School," where she worked
22  27 years as a school secretary.  She's your
23  mother.

24         **INMATE PARKER:**  Yes.

25         **PRESIDING COMMISSIONER SAWYER:**  She feels
26  that you have been rehabilitated and are
27  suitable for parole.  "He is currently serving

25

1  time and he has not been in trouble going on 12
2  years now.  His counselors and people he knows
3  can verify this.  He has earned his GED and
4  enrolled in Professional Career Institute, the
5  School of Home Inspection.  He has received his
6  certificate way before his graduation date.  His
7  father and I will provide housing, clothing,
8  transportation once he gets a job."  I don't
9  think that's what she means.
10          **ATTORNEY TARDIFF:**  Yeah.
11          **PRESIDING COMMISSIONER SAWYER:**  "His
12  father and I will provide housing, clothing and
13  transportation once he gets a job."
14          **ATTORNEY TARDIFF:**  Until he gets a job.
15          **INMATE PARKER:**  Until he gets a job.
16          **PRESIDING COMMISSIONER SAWYER:**  "I know
17  he's already been offered a job.  His dad is
18  self-employed working as a maintenance person
19  and can always use the help.  Clifford has a
20  brother and three sisters and many nieces and
21  nephews, grandnieces as well as our Church
22  Pastor James Long, Junior, [phonetic], who is
23  ready and eager to spend time with him since our
24  church has a youth -- is a youth ministry
25  church.  Clifford will stay with us until he is
26  able to support himself financially and give
27  something back to the community.  I know he is

26

1    remorseful for what he has done.  Our faith in
2    the Lord has helped us and our family to ask for
3    forgiveness for what happened.  I would like to
4    thank you in advance."  Signed Mary Ann Parker.
5    Okay, it says that you have reinforced your
6    relationship with your family members, fiancée,
7    and "help, encourage continued improve myself
8    spiritually, academically and technically.  Seek
9    numerous jobs to employ my home inspection and
10   meat cutting skills, certified to perform.  Move
11   into a residence with my fiancée, marry my
12   fiancée.  I will also be doing volunteer work at
13   Shiloh Christian Fellowship Church and the
14   A-I-G-A Foundation as a mentor to youth at
15   risk."  And then you go on to talk about the
16   next two to five years, "I will --" and then you
17   talk about going to school, be an independent
18   home inspector, and your goals are to establish
19   a vending business.

20        **INMATE PARKER:**  Yes.

21        **PRESIDING COMMISSIONER SAWYER:**  Okay,
22   let's look through these letters of support.  I
23   have a letter from -- you're going to have to
24   help me with her name.

25        **INMATE PARKER:**  Kamini [phonetic].

26        **PRESIDING COMMISSIONER SAWYER:**  Kamini
27   Desigh [phonetic].  And that's you, that's

27

1    your --

2          INMATE PARKER:  My fiancée.

3          PRESIDING COMMISSIONER SAWYER:  --

4    fiancée.  And this is November 2005, "To whom it

5    may concern.  I had a relationship for about

6    eight years."  She knows that you are goal

7    driven, success oriented, determined,

8    compassionate, insightful, loving individual.

9    "He has dedicated his life to God.  He'll be a

10   productive contributing member to society.  I'm

11   willing to take care of him and provide him with

12   all of the support that he will need.  I promise

13   to give him a stable, safe residence that he

14   will need."  And her updated address is in Union

15   City?

16         INMATE PARKER:  Yes.

17         PRESIDING COMMISSIONER SAWYER:  Is it an

18   apartment?

19         INMATE PARKER:  Yes, sir.

20         PRESIDING COMMISSIONER SAWYER:  Does she

21   have anybody else living there?

22         INMATE PARKER:  No.

23         PRESIDING COMMISSIONER SAWYER:  Does she

24   have any children?

25         INMATE PARKER:  No, she just has a puppy

26   that she calls her daughter.  (laughter)

27         PRESIDING COMMISSIONER SAWYER:  A puppy?

28

1          INMATE PARKER:  Yeah.

2          PRESIDING COMMISSIONER SAWYER:  Do you

3    like dogs?

4          INMATE PARKER:  Yes.

5          PRESIDING COMMISSIONER SAWYER:  Okay.

6          DEPUTY COMMISSIONER ROTHLISBERGER:  I

7    just hope the dog likes him.

8          PRESIDING COMMISSIONER SAWYER:  Uh, we

9    don't know that.  Okay, she talks about the

10   Rouse and Juarez Trucking.  Then she's the one

11   that connected you with that?

12         INMATE PARKER:  Right.

13         PRESIDING COMMISSIONER SAWYER:  Okay.  Do

14   you know what it takes to get a truck driver's

15   license today?

16         INMATE PARKER:  Well, no.  I know that

17   it's a small truck so I don't really need to get

18   a -- it's like a van.

19         PRESIDING COMMISSIONER SAWYER:  A van,

20   okay.

21         INMATE PARKER:  It's for small parcel

22   deliveries.

23         PRESIDING COMMISSIONER SAWYER:  Okay, so

24   it's not an 18-wheeler or --

25         INMATE PARKER:  No, no.

26         PRESIDING COMMISSIONER SAWYER:  Or a

27   triple axel or anything like that?  Because

29

1    there are all kinds of restrictions on
2    commercial driver's licenses now, but if it's
3    just a delivery van it probably wouldn't be any
4    problem.  It talks about your positive plans and
5    being a productive citizen.  She is praying that
6    her letter "will have an impact on the decision
7    to release Clifford."  She's asking for a chance
8    for you to be a good husband, future father.  "I
9    believe that he regrets the decision that he
10   made 13 years ago.  He has done the time
11   required to rehabilitate himself for a future
12   outside of prison."  Okay, and then we have one
13   from Rouse and Juarez Trucking Company, "Bay
14   [phonetic] Gee [phonetic] Enterprises,
15   specializing in home, commercial and private
16   vending."  It's from Thelma Williams, Houston,
17   Texas.  Dated August 17, 2005.  "It is our
18   sincerest pleasure to have a program established
19   for those that will soon be making a transition
20   back into society who demonstrate a desire and
21   aptitude to achieve despite all the negative
22   influence that exist from everyday prison life.
23   Due to Mr. Parker's experience in vending and
24   trucking we at Bay Gee Enterprises are prepared
25   to offer Mr. Parker an entry level position in
26   our company starting at a base salary of $17.75
27   an hour.  The potential for growth is limitless.

30

1    This is a Christian based company that believes
2    in the redemption of the soul and that everyone
3    deserves an opportunity to correct a mistake and
4    live in harmony with the Creator."   Where is
5    this located?
6        INMATE PARKER:   Well, it's based in Texas
7    but they have like jobs out here and it's like
8    part-time jobs.  My family knows her from
9    church.  So she offered me a job.
10       PRESIDING COMMISSIONER SAWYER:   Does
11   Thelma Williams -- have you ever talked with
12   Thelma Williams?
13       INMATE PARKER:   I've talked to her and
14   she's the one who wrote the letter.
15       PRESIDING COMMISSIONER SAWYER:   And she
16   lives in Houston?
17       INMATE PARKER:   She lives in Houston, but
18   she has a home out here somewhere.
19       ATTORNEY TARDIFF:   So the work would be
20   here in California?
21       INMATE PARKER:   Yes.
22       PRESIDING COMMISSIONER SAWYER:   Okay, the
23   Asian Pacific Islander Group of, let's see, the
24   Islander Group of All Islands Getting Along.
25   And George -- help me with his last name.
26       INMATE PARKER:   Malau'ulu.
27       PRESIDING COMMISSIONER SAWYER:

31

1    M-A-L-A-U, apostrophe U-L-U.

2         **INMATE PARKER:**  Right.

3         **PRESIDING COMMISSIONER SAWYER:**  Okay.  "A

4    non-profit organization designed to educate,

5    empower and equip the youth of our community."

6    A Samoan word, A-I-G-A, it means family?

7         **INMATE PARKER:**  Yes, sir.

8         **PRESIDING COMMISSIONER SAWYER:**  Religious

9    beliefs.  "The program includes athletic

10   clinics, a combination of violence prevention

11   forms for school tutorials, SATS preparation,

12   student athlete counseling and training.

13   Members involved with the youth center service.

14   It wasn't until 1998 that we were blessed with

15   the ability to begin this organization and in

16   just six years our efforts have expanded to

17   California, Oregon, Utah, Hawaii, and Samoa.  We

18   have serviced the extra curricular needs to more

19   than ten thousand scholars and athletes and we

20   are steadily growing."  The people there are in

21   support of Clifford Parker and his release.

22   "Active members of our incarcerated chapter --

23   he's an active member of our incarcerated

24   chapter and has served a vice president for the

25   past two years.  He's commitment to our at risk

26   youth, while facing his own adversity, is a true

27   testament to his spirit and his contributions to

32

1    the organization have been immeasurable."   What

2    kind of contributions have you made to this

3    organization?

4         **INMATE PARKER:**   Writing.   I write letters

5    to the (indiscernible) youth at risk.   This

6    organization has people involved such as

7    (indiscernible), different professions,

8    professional football players, college players.

9    And my experience of going through is a

10   different twist to it, because see their

11   successful in what they've done and I've been

12   through some unfortunate lows so I'm able to

13   really talk to, write letters to the children

14   just to tell them that it's the wrong road to go

15   down; watch your choices and make the right

16   choices.

17        **PRESIDING COMMISSIONER SAWYER:**   Okay,

18   "recently we understand that he's completed the

19   home inspection program from Professional Career

20   Development Institute, as well as real estate

21   principles and practices at the Valley Adult

22   School.   These are trades that could be very

23   valuable to our A-I-G-A habitat for humanity

24   program.   Without reservation we offer this

25   letter to extend to Mr. Parker because I believe

26   he would be an asset to our foundation."   And

27   that's signed by George Malau'ulu.   (laughter by

33

1    others)  I'm sorry.  Okay, this is a letter from

2    Correctional Training Facility, Soledad,

3    stationary, from W. Roger, R-O-G-E-R-S, SSC,

4    Senior Supervising Clerk --

5          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Cook.

6          **PRESIDING COMMISSIONER SAWYER:**  Cook,

7    sorry.  Currently supervising cook here at the

8    Correctional Training Facility, currently --

9    "Mr. Parker is currently employed as a meat

10   cutter in the butcher shop for the entire tri-

11   facility."  And he talks about the use of the

12   equipment, tenderizers, grinders, graters,

13   slicers, scales, handheld knives, cutting,

14   grinding, grating meat and cheese products, for

15   appropriately seventy-two hundred.  Is that how

16   many you feed a day, seventy-two hundred people?

17         **INMATE PARKER:**  Yes.

18         **PRESIDING COMMISSIONER SAWYER:**

19   Responsible for the butcher shop, clean and

20   sanitize, loading and unloading trucks, using

21   battery operated pallet jacks.  "The experience

22   that Mr. Parker has gained with the three years

23   of employment has been invaluable to this

24   institution.  He possesses the necessary skills

25   to obtain respectable employment upon release.

26   He should benefit from his marketable skills and

27   meat cutting, shipping, handling, business.

34

1    Commended for his exceptional efforts and

2    positive behavior.  This letter should serve as

3    authentication --" help me.

4           **DEPUTY COMMISSIONER ROTHLISBERGER:**

5    Authentication.

6           **PRESIDING COMMISSIONER SAWYER:**  "--

7    authentication --"  The eyes are working but the

8    tongue is not.

9           **DEPUTY COMMISSIONER ROTHLISBERGER:**  I

10   know.

11          **PRESIDING COMMISSIONER SAWYER:**  "And the

12   type of employment that he seeks.  He comes with

13   the highest recommendations."  Signed by

14   Mr. Rogers and by Mr. Rodriquez,

15   R-O-D-R-I-Q-U-E-Z, and he's the culinary

16   supervising cook in the butcher shop.  Okay, did

17   I cover your letters?

18          **INMATE PARKER:**  Yes.

19          **PRESIDING COMMISSIONER SAWYER:**

20   Adequately, sir?

21          **INMATE PARKER:**  Yes, sir.

22          **PRESIDING COMMISSIONER SAWYER:**  Okay,

23   very good.  Thank you.  We got a little

24   overwhelmed when we got this package.

25          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yeah.

26          **PRESIDING COMMISSIONER SAWYER:**  But we're

27   managing to get through it.  We're good at that.

1   Okay, Commissioner Rothlisberger?

2          **DEPUTY COMMISSIONER ROTHLISBERGER:** Okay,

3   I wanted to see if it was still morning or if

4   we've gone into the afternoon yet.  Good

5   afternoon.  I'm going to cover your post

6   conviction factors from the date of your last

7   Hearing, which was November 16, 2004, until the

8   present.  I do appropriate the handouts that

9   you've given me and I think I have most of it,

10  but I think there may be some things that I

11  don't have and we can cross-reference them,

12  okay.  First of all I've reviewed your Central

13  File, your life prisoner evaluation report

14  prepared for the November 2005 calendar by

15  Correctional Counselor I F.I. DeGuzman,

16  capital D, small E, capital G-U-Z-M-A-N, post

17  conviction progress reports covering the period

18  of November 16, 2004 to the present, and the

19  psychological evaluation prepared for the

20  November -- wait a minute, do we have a new one?

21         **ATTORNEY TARDIFF:**  5/26/06.

22         **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yeah,

23  wait a minute; I just had it.  Thanks.  It's

24  here somewhere.  Okay, 5/26/06, and that was

25  prepared by M. Macomber, PhD., for the June 2006

26  calendar, and the spelling of that is

27  M-A-C-O-M-B-E-R.  Okay, first of all at the time

36

1   of your last Consideration Hearing on

2   November 16, 2004, you were housed here at CTF,

3   correct?

4          **INMATE PARKER:**   Yes.

5          **DEPUTY COMMISSIONER ROTHLISBERGER:**   And

6   the Board took action to deny parole for one-

7   year.

8          **INMATE PARKER:**   That's right.

9          **DEPUTY COMMISSIONER ROTHLISBERGER:**

10  Requesting you to stay disciplinary free, which

11  you have, and to earn positive chronos, which

12  you have.  Okay.  You're prior classification

13  score was 19, which is the minimum mandatory, or

14  mandatory minimum.  And your current score is

15  19.  Your custody, prior custody level is a

16  Medium A and your current custody level is a

17  Medium A.  I also do not find any enemies or

18  gang affiliation.  Vocational instruction, while

19  the reports indicate none, I will, also,

20  indicate that you do have, although some of

21  these may be considered some of academic, you do

22  have the FEMA certificate of achievement, I did

23  see that in your file.  And, also, you have the

24  prior meat cutter, well, the safety inspector

25  and technician, your certified home inspector

26  with a certified diploma, and that was actual,

27  you had that before your last Hearing, correct?

 1          **INMATE PARKER:**  Right.

 2          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay,

 3   and your hazardous waste material technician.

 4   In addition, your work participation has been

 5   when you were assigned as a meat cutter

 6   receiving above average to exceptional grades.

 7   And that began back in, or at least as early as

 8   before your last Hearing on July 21, 2004.  And

 9   then currently your most -- you are still

10   assigned as a meat cutter full time and the work

11   supervisor report reflects satisfactory to above

12   average grades.  You did complete the 12-Week

13   Anger Management class sponsored by Judge

14   C. Lindsey, L-I-N-D-S-E-Y, Protestant Chaplin,

15   that was on December 8, 2005, as well as a

16   laudatory chrono for the generous contribution

17   for the April 4th Easter Banquet, but that was

18   before your last Hearing, but laudatory chronos

19   for your participation in AA, and since your

20   last Hearing that would be 12/31/04, 6/30/05,

21   and 9/30/05.  Laudatory for successful

22   completion of the Christian Basics class dated

23   1/24/05, and a laudatory for completion of

24   Dr. Thomas Gordon's [phonetic] Family

25   Effectiveness Training Harmony in the Home Self-

26   Help Improvement.  Is that like an anger

27   management course?

38

1        **INMATE PARKER:**  Yes.

2        **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay,

3    great.   Other chronos that I have and I want to

4    make sure that we cover all the ones that you

5    have and your certificates.  So let me go by

6    those.  We do have the Anger Management and that

7    was on December 22, 2005; the Valley Adult

8    School, Real Estate Principles and Practices,

9    well, that's pretty vocational oriented,

10   9/26/05, and that was from instructor J.

11   Kingston, K-I-N-G-S-T-O-N; a Prison Fellowship

12   Boundary certificate for participation, June 11,

13   2005; a certificate of achievement from the

14   Crossroad Bible Institute, you successfully

15   completed Great Truths of the Bible, dated

16   May 10, 2005; here's your FEMA certificate, and

17   it was after your last Hearing, April, the 27th

18   day of April, 2005; Emergency Management

19   Institute certificate of completion for the

20   Thomas Gordon's Family Effectiveness, and we did

21   mention that, on February 24, 2005; the six-hour

22   seminar on Sexual Purity, February 12, 2005;

23   another Emergency Management Institute,

24   February 10, 2005, completion of Emergency

25   Management Institutes Professional Development

26   Series; certificate of achievement to the

27   Christian Basic Class and that is from

39

1    February 6, 2005, and that was a 12-week

2    prescribed study; Central Protestant Chapel,

3    certificate of appreciation for outstanding work

4    in preparation of the Central Protestant

5    Chapel's Annual Christmas Banquet, and that was

6    December 16, 2004, and so that was right after

7    your last Hearing.  Do you have any other

8    certificates? Or is that them?  I think that's

9    quite -- you've been busy.  Okay.  And again,

10   the chronos, we've got an AA in March 31, 2006;

11   we have one for participation in self-esteem

12   group by the staff psychiatrist dated

13   January 19, 2006; another AA chrono dated

14   12/30/2005; Anger Management, and this is the

15   one you have the certificate for also,

16   December 8, 2005, and that was the 12-week

17   course; Central Facility would like to thank you

18   on behalf of Central Facility for the hard work

19   on November 23, 24 in 2005, to make the

20   Thanksgiving meal an enjoyable experience.  You

21   cooked a Thanksgiving meal for seventy-two

22   hundred people.  What did that consist of?

23          INMATE PARKER:  Turkey, we had to cut a

24   lot of turkey for seventy-five hundred people.

25          DEPUTY COMMISSIONER ROTHLISBERGER:  I bet

26   you did.  Oh, my, okay.  10/20/05 been assigned

27   to butcher shop, a laudatory chrono from L.

40

1   Rodriquez, saying that you possess the necessary
2   skills and you need to be commended for
3   extraordinary efforts and positive behaviors.
4   Another AA chrono dated 9/30/2005; 6/30/2005,
5   again AA; 3/31/05, AA and NA; 2/25/05, the
6   Dr. Gordon's Family Effectiveness Training in
7   Harmony and the Christian Basics class, and we
8   discussed this, you got a certificate and you
9   also got a laudatory chrono dated January 24,
10  2005; and your AA and NA 12/31/04.  I just want
11  to check the tape.  Let me go ahead and take a
12  break and turn it over before I ask my question,
13  okay.
14                  (TAPE 1, SIDE A, ENDS)
15                  (TAPE 1, SIDE B, BEGINS)
16  How often do you get to go to AA?
17          **INMATE PARKER:**  Once a month.
18          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Once
19  a month.  Yeah, I hear it's pretty hard to get a
20  meeting around here.  And what tools have you
21  learned in AA that you think you'll take outside
22  with you?
23          **INMATE PARKER:**  Well, actually
24  (indiscernible), just spiritually.  There's a
25  lot of -- I'm into the church, I'm going to
26  church and I think God has shown me a lot.  And
27  through AA I've learned a lot just about talking

1    about searching the moral inventory of myself,
2    which I constantly do daily now just to keep
3    myself from going into that direction.  So I
4    think has taught me a lot, it's AA and NA in
5    that class.

6         **DEPUTY COMMISSIONER ROTHLISBERGER:**
7    Right.

8         **INMATE PARKER:**  And it's taught me a lot
9    about life in general.  About how to treat
10   others, and how to treat yourself more than
11   anything.  And, you know, I like going and the
12   reason that I go is not because I have an
13   alcohol problem --

14        **DEPUTY COMMISSIONER ROTHLISBERGER:**  Uh
15   huh.

16        **INMATE PARKER:**  or drug problem --
17        **DEPUTY COMMISSIONER ROTHLISBERGER:**  I
18   know I did read that in the file.  No one thinks
19   you --

20        **INMATE PARKER:**  Yeah, I do it as a pro-
21   social activity now, to be able to dialog with
22   people and I'm just willing to help a lot of
23   people now.  So it helps me when like guys show
24   up on the yard, youngsters who have a
25   determinate term and they're going to be
26   released, I talk to them about God and what the
27   12-Steps have done for me, a lot of what self-

42

1    help has done for me.

2        **DEPUTY COMMISSIONER ROTHLISBERGER:** Uh
3    huh.

4        **INMATE PARKER:** And I try and influence
5    them, I say: "look, don't take that path, it's
6    not worth it or you'll be sitting there with a
7    life sentence." So I mean it helps me out in
8    that manner.

9        **DEPUTY COMMISSIONER ROTHLISBERGER:**
10   Excellent. I wanted to go over the correctional
11   counselor and that would be again that was
12   F.I. DeGuzman, and he recommended that you
13   remain disciplinary free, you participate in
14   self-help, if available, and earn positive
15   chronos. Now, Dr. Macomber stated that your
16   Axis I is no mental disorder; your Axis II is no
17   personality disorder; your GAF score is high,
18   it's a 90. He stated regarding your assessment
19   of risk, evidence does not pose, he says: "you
20   do not pose a security risk in any way. He has
21   remained entirely disciplinary free throughout
22   14 years of incarceration. In comparison to
23   other inmates his violence potential is
24   definitely below average. And considering
25   potential for dangerous behavior when released,
26   he used the level of service inventory revised,
27   and you obtained a score of zero point eight

43

1    cumulative frequency.  This score means that if
2    100 men were released on parole that you would
3    be expected to do better on parole than 99 of
4    them.  This is an extremely low risk level and
5    as a result he poses no more risk to society
6    than the average citizen.  In fact due to his
7    growth and maturity over the years, he poses
8    less risk to society than the average citizen in
9    the community.  And there are no significant
10   risk factors in the case regarding clinical
11   observations, recommendations, no mental or
12   emotional problems that should interfere with a
13   routine release planning.  Mr. Parker has a
14   great deal of family support in the community.
15   He has residence offers as well as job offers.
16   His job offers are realistic and valid.  All
17   these factors suggest a very good parole
18   adjustment based upon research.  He has no
19   alcohol or drug problems and therefore the
20   prognosis for successful adjustment in the
21   community is excellent."  And that was from
22   Dr. Macomber.  Have I covered everything,
23   counsel?

24           **ATTORNEY TARDIFF:**  I believe so, yes.
25           **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay.
26           **ATTORNEY TARDIFF:**  You've got Prison
27   Fellowship.

44

1          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yes.

2          **ATTORNEY TARDIFF:**  Yeah, you've got that.

3          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Okay,

4   thank you.  Commissioner.

5          **PRESIDING COMMISSIONER SAWYER:**  Thank

6   you.  Tell me about this Home Inspection

7   Certificate that you got.  What is that for?

8          **INMATE PARKER:**  Yeah, it's a course where

9   when I go into a home, it's a job where I go in

10  and I learn a lot about -- I'm not like how do

11  they put it.  I'm not a master of it all, it's

12  just that I learned some portion of how to look

13  at a home.  Like, I don't know a lot about

14  electricity or electronics and stuff, but it's a

15  format where I go in and I look at the window

16  and see if it's got any cracks in it.  I'm not -

17  - it's not -- I've learned just a lot about

18  inspecting a home, the foundations, the sidings,

19  just to go in and find anything wrong.  It's

20  called observe and report.  So I go in and it's

21  just looking.  I don't touch nothing, I don't

22  open anything up.  I just make a report out of

23  what I see.

24          **DEPUTY COMMISSIONER ROTHLISBERGER:**  Is

25  that like when you get a home inspection when

26  your buying your home?

27          **INMATE PARKER:**  Right.

45

1          **ATTORNEY TARDIFF:**  And are you qualified
2   to do that?
3          **INMATE PARKER:**  Yes, ma'am.
4          **ATTORNEY TARDIFF:**  In the State of
5   California?
6          **INMATE PARKER:**  Yes, ma'am.  I graduated
7   from an institute.
8          **PRESIDING COMMISSIONER SAWYER:**  Is there
9   a State license for that?
10         **INMATE PARKER:**  Yes.  I got -- I'm
11  certified, I just need a diploma from the
12  Professional Institute.
13         **ATTORNEY TARDIFF:**  And how long did it
14  take?
15         **INMATE PARKER:**  It took me a minimum of a
16  year and a half.
17         **ATTORNEY TARDIFF:**  A year and a half.
18         **PRESIDING COMMISSIONER SAWYER:**  Okay.
19  And how many units do you have in the Real
20  Estate Principles and Practices?
21         **INMATE PARKER:**  I have a certificate of
22  completion.
23         **PRESIDING COMMISSIONER SAWYER:**  Uh huh.
24         **INMATE PARKER:**  It's a course we can take
25  through Valley Adult School.
26         **PRESIDING COMMISSIONER SAWYER:**  How many
27  -- okay, did they give you any -- how many hours

46

1  is it?

2       INMATE PARKER:  Well, it's an open book.

3  It just depends on how long you take.  It's like

4  an (indiscernible) study.

5       PRESIDING COMMISSIONER SAWYER:  Okay, so

6  it's a correspondence course?

7       INMATE PARKER:  Right.  Well, it's

8  actually through the institution here.

9       PRESIDING COMMISSIONER SAWYER:  Right.

10      ATTORNEY TARDIFF:  So do you get units

11  for it?  Is that it?

12      INMATE PARKER:  No.

13      DEPUTY COMMISSIONER ROTHLISBERGER:  He

14  does it for --

15      INMATE PARKER:  You can actually transfer

16  the units to a college courses, but ....

17      PRESIDING COMMISSIONER SAWYER:  And tell

18  me about this Business Principles and

19  Management?

20      INMATE PARKER:  Business Principles and

21  Management.

22      PRESIDING COMMISSIONER SAWYER:  Uh huh.

23      INMATE PARKER:  That was interesting.

24  That's the course I'm in and it's learning how

25  to own your own business.

26      PRESIDING COMMISSIONER SAWYER:  Uh huh.

27      INMATE PARKER:  About what it takes and

1  about business plans, how to write a business

2  plan, how to implement the business plan.  And

3  those are the things that I'm learning.  That's

4  something I want to continue on the street.

5      **PRESIDING COMMISSIONER SAWYER:**  And you

6  completed that in April?

7      **INMATE PARKER:**  Yes.

8      **PRESIDING COMMISSIONER SAWYER:**  Of this

9  year?

10     **INMATE PARKER:**  Right.

11     **PRESIDING COMMISSIONER SAWYER:**  Okay,

12  Mr. Waddell, do you have any questions?

13     **DEPUTY DISTRICT ATTORNEY WADDELL:**  I have

14  no questions.

15     **PRESIDING COMMISSIONER SAWYER:**  Thank

16  you.  Do you have any questions, Ms. Tardiff?

17     **ATTORNEY TARDIFF:**  I have a couple.  And

18  it's going to the commitment offense, which is

19  kind of unusual for me to ask questions, but I -

20  - because I know that, you know, when you

21  initially look at this case you think that

22  Mr. Parker, you know, his capability, you want

23  to say is more than what he received his

24  conviction for.  So I discussed it with him

25  somewhat before the Hearing and I got a lot of

26  insight into the situation.  So I would like to

27  ask him:  Now, at the time of commitment offense

48

1    you were 25 and your brother was 32?

2          **INMATE PARKER:**  Yes.

3          **ATTORNEY TARDIFF:**  And your brother was

4    unemployed.  Is that correct?

5          **INMATE PARKER:**  Yes, ma'am.

6          **ATTORNEY TARDIFF:**  Okay, and he had been

7    living in San Diego and came up to, I guess,

8    hang out with you?

9          **INMATE PARKER:**  Right.

10         **ATTORNEY TARDIFF:**  Now, had your brother

11   served any prior prison terms?

12         **INMATE PARKER:**  Yes.

13         **ATTORNEY TARDIFF:**  And what had -- is he

14   getting picked up on that?

15         **DEPUTY COMMISSIONER ROTHLISBERGER:**  Yes.

16         **ATTORNEY TARDIFF:**  Okay, and what did he

17   serve time for?

18         **INMATE PARKER:**  Kidnapping.

19         **ATTORNEY TARDIFF:**  Kidnapping and

20   robbery?

21         **INMATE PARKER:**  And robbery, yes.

22         **ATTORNEY TARDIFF:**  Okay, so he had done

23   this type of thing before?

24         **INMATE PARKER:**  Yes.

25         **ATTORNEY TARDIFF:**  Okay.  Now, I noted

26   that in one of the police reports, well actually

27   the probation officer's report, where the

49

1   probation officer questioned, well, actually

2   first of all there had been a letter submitted

3   from a juror who stated that she does not

4   believe that the defendant knew that the victim

5   would be robbed and kidnapped.  She felt that

6   your brother and Mr. Wilson picked him up, you

7   know, did this.  And then in the evaluation the

8   probation officer says that:  "there appears to

9   be no reason to believe that this victim would

10  have been chosen had it not been for the

11  defendant's involvement and knowledge of the

12  intricacies of the schedule and the job."  Now,

13  what was there a means of your brother

14  ascertaining the victim's schedule and so forth?

15       **INMATE PARKER:**  Through me.

16       **ATTORNEY TARDIFF:**  Through you.  And how

17  was that?  Did he used to go to work with you or

18  something?

19       **INMATE PARKER:**  He got in the

20  weightlifting and he was very big guy and he

21  would hangout and lift weights.

22       **ATTORNEY TARDIFF:**  And that was on the

23  job where you were, the gym?

24       **INMATE PARKER:**  Right, at the Oakland

25  Naval Supply Center.

26       **ATTORNEY TARDIFF:**  Okay, so you would

27  take him there with you?

50

1        **INMATE PARKER:** Right.

2        **ATTORNEY TARDIFF:** And then he started

3    asking you questions about the job and this and

4    that?

5        **INMATE PARKER:** He was standing there

6    when I filled the vending machines up and he

7    would ask me questions like: "whose machine is

8    this? Who does this machine, that machine, the

9    money machine?"

10       **ATTORNEY TARDIFF:** So he was trying to

11   get the information out of you. So this

12   statement your brother probably knew enough

13   information on his own about the job to pull

14   something off?

15       **INMATE PARKER:** Right.

16       **ATTORNEY TARDIFF:** Okay. Would you say

17   that you were greatly influenced by your

18   brother?

19       **INMATE PARKER:** I would say I was. But

20   like I told you earlier, it's not excuse for my

21   actions. I'm the one that actually made the

22   conscience decision to do it. He had a strong

23   influence over me.

24       **ATTORNEY TARDIFF:** And he had a strong

25   influence because you were the youngest child --

26       **INMATE PARKER:** Yeah.

27       **ATTORNEY TARDIFF:** -- and he was your

51

1   older brother?

2        **INMATE PARKER:**  Right.

3        **ATTORNEY TARDIFF:**  I also noted that --

4   did he have some kind of reputation in the

5   community?

6        **INMATE PARKER:**  Well, just the tough guy

7   image from being incarcerated most of his life

8   and juvenile to Youth Authority to prison.

9        **ATTORNEY TARDIFF:**  So today now if you

10  were confronted with a situation where somebody

11  you thought was say better than you or was more

12  education or had more going for them, and they

13  came along and asked you:  "Hey, you know, I got

14  this deal going and I know you just got out of

15  prison and it's going to be rough and it can

16  give you some money," today what would you do in

17  a circumstances like that?

18       **INMATE PARKER:**  Walk away.  I don't think

19  anyone could have any influence on me like that

20  every again.  Doing this time in prison I've

21  seen a lot, Ms. Tardiff.  I've seen so much

22  where I constantly see violence, people getting

23  bullied and things like that.  And so that could

24  never happen again to me every.  I'm grown, I'm

25  not that -- I was 24, but I was a bit naive and

26  immature back then.  I've grown so much as a man

27  and seek desirables out of myself and I've

52

1  become a better person.

2      **ATTORNEY TARDIFF:**  So since you've been

3  incarcerated have you ever been confronted say

4  on the yard or in your housing to do something

5  and you were able to make the choice not to?

6      **INMATE PARKER:**  Absolutely, it happens.

7      **ATTORNEY TARDIFF:**  Now, this issue of

8  Mr. Wilson's -- what was the name of the victim,

9  Wilson?

10      **INMATE PARKER:**  No, Walter Wainwright.

11      **ATTORNEY TARDIFF:**  Walter Wainwright.

12  His body, there keeps being a question about,

13  you know, why don't you disclose where he's at

14  and this and that.  Do you have an answer for

15  that?

16      **INMATE PARKER:**  I don't have no answer

17  for where Walter is, none whatsoever.  I mean I

18  don't know if it's admissible, but I'm willing

19  to take a polygraph test, whatever it takes.  I

20  don't have no knowledge of that.  I've

21  constantly contacted my brother and family

22  members -- what does he have to lose, he's never

23  getting out of prison, but he won't tell me

24  anything that can help me.

25      **ATTORNEY TARDIFF:**  So the last you knew

26  of where he was, was in the motel room?

27      **INMATE PARKER:**  In the motel, in

53

1   (indiscernible), California.

2       **ATTORNEY TARDIFF:** Okay, and you're

3   brother is just not cooperating at all in

4   divulging the information. Okay. I don't have

5   anything further.

6       **PRESIDING COMMISSIONER SAWYER:** Thank

7   you. I have a question for you: In the

8   probation officer's report they talk about you

9   and some of your history here, your education,

10  your health, your leisure time. And then it

11  says: "prior to the breakup of his girlfriend

12  the defendant claims he drank alcohol on an

13  occasional social basis. However, from May 1992

14  until his arrest in July of 1992 he was drinking

15  all day."

16      **INMATE PARKER:** That's inaccurate.

17      **PRESIDING COMMISSIONER SAWYER:** What does

18  that mean?

19      **INMATE PARKER:** That is actually

20  inaccurate. I had been drinking all day and was

21  still going to work. My brother drank a lot. I

22  was still going to work and taking care of

23  things. It was depressing, I went through a

24  real difficult time, I got my heart broke, and I

25  kind of latched on to my older brother. I mean

26  I've never really drank much, I don't like

27  alcohol.

54

1     **PRESIDING COMMISSIONER SAWYER:**  Okay.  Do
2     you have any questions?

3     **DEPUTY COMMISSIONER ROTHLISBERGER:**  None,
4     thank you.

5     **PRESIDING COMMISSIONER SAWYER:**  Okay,
6     Mr. Waddell, would you like to make a comment?

7     **DEPUTY DISTRICT ATTORNEY WADDELL:**  Sure,
8     thank you.

9     **PRESIDING COMMISSIONER SAWYER:**  thank
10    you.

11    **DEPUTY DISTRICT ATTORNEY WADDELL:**  I
12    think I will just speak to the issue of the
13    commitment offense, and basically I recommend
14    for unsuitable primarily on that.  Since in all
15    candor the inmate seems to have done reasonably
16    well in most of the other areas, which has been
17    discussed.  However, as far as the commitment
18    offense is concerned, this is, of course, a 209
19    conviction, a jury verdict.  The victim clearly
20    was abused during the course of this kidnapping.
21    His mouth and hands were taped and he was locked
22    in the truck of a vehicle and driven around for
23    a substantial period of time.  The witness, the
24    one witness who did see him said that he
25    appeared to be terror-stricken.  The motive was
26    quite trivial, they apparently only got about
27    $4,0000 maximum from this little escapade from

55

1   the vending machine money, and it was probably
2   split three ways, at least that would be logical
3   inference, although the inmate says that he
4   didn't get any of it.  It clearly showed a
5   callous disregard for suffering on the part of
6   the inmate.   Particularly worthy of note is that
7   he ran out of the apartment and slammed the
8   trunk on the head of the victim as he was trying
9   to escape, which was opined by the probation
10  officer, might have gone a long way toward the
11  defusing this whole thing and eliminating the
12  specter of death which hangs over the head of
13  Mr. Parker and his involvement in this crime.  I
14  think it can probably be debated as to whether
15  or not he had a leadership role in the crime.
16  He certainly participated in the planning of
17  this robbery, the selection of the victim, they
18  used his car, and he certainly was a willing
19  participant, and but for his cooperation --
20  clearly, he could have certainly warned the
21  victim that something was going on and defused
22  it and made it impossible.  But for his
23  involvement this never would have happened.  So
24  he cannot escape responsibility and clearly he
25  does not want to escape responsibility at this
26  particular point in time.  Other crimes were
27  certainly an intrical part of the commitment

56

1   offense, to wit, the 209, and that would be, of
2   course, the murder. The conduct of the inmate
3   placed the victim in a position where he became
4   the victim of a murder at the hands of the
5   inmate's brother. It clearly, again, his
6   conduct was such that but for that conduct the
7   murder would not have occurred. There is an
8   inference that the killing, perhaps, was done to
9   silence a potential witness to the robbery, the
10  botched robbery. The inmate, according to the
11  probation report, aquiest in the notion that the
12  victim had to be gotten rid of. It is clear
13  that the victim saw the inmate, and the inmate
14  was the only person that the victim would
15  recognize. And as the probation officer pointed
16  out it was certainly in his, the inmate's
17  interest that the victim be dispatched; he had
18  the most to gain from it. And, of course, the
19  body of the victim was never found. He had
20  numerous opportunities to withdraw from this
21  conspiracy, as did one of the conspirators,
22  Mr. Frank Wilson, and he could have followed
23  that path, and perhaps saved himself a lot of
24  pain and suffering as well as a lot of pain and
25  suffering on the part of the victim. He
26  violated a special trust with the victim, who
27  was a co-worker of his and was lead into this

1    situation.  And the victim clearly was
2    vulnerable, there was a comment in there that
3    the inmate made comments that the victim was
4    small and skinny, and they wouldn't need any
5    weapons in order to perpetrate this thing.  The
6    inmate was at that point six-four and 260, and
7    the victim was no match for him in terms of
8    putting up any resistance.  Of course, we learn
9    now from *Danenberg* that the crime alone is in
10   fact sufficient to justify denial providing
11   there are aggravating circumstances beyond those
12   which are necessarily elements of the crime, to
13   wit, the death or murder of the victim is not an
14   element of the 209, and that is an aggravating
15   circumstance and that standing along can justify
16   a denial as well as the fact, of course, that
17   the victim's family in a confidential letter,
18   which we don't have privilege to, but I presume
19   that they expressed some dismay with the inmate
20   and were opposed to parole.  Another element
21   that, I think, is interesting in this case is
22   that even if the Board were to find the inmate
23   suitable there is a question of what would the
24   term be.  If you look at the matrix for a 209,
25   which is probably 3A, it refers back to the
26   section, regulations 2282(b), which, in fact, is
27   the old first-degree murder matrix, and that

58

1    would indicate eleven to 15 years.  Subsequent
2    to that, however, the new first-degree murder
3    matrix, I think it was 2005 or so, where the
4    same matrix 3A would give a 27 to 29 year
5    sentence.  So if we  -- where the kidnapping
6    results in the death of the victim it refers
7    back to the first-degree murder matrix, and the
8    query is which one do you use, eleven to 15 or
9    the 27 to 29?  I actually took the liberty of
10   contacting the BPT legal on this point and spoke
11   to an Andrew Woodrow [phonetic], of course, he
12   indicated to me that he was only able to give
13   legal views to be BPT and not to me, and I
14   wasn't wanting that.  But he said to me that
15   this clearly was a case of first impression that
16   there were legitimate arguments on both sides
17   and it is something that he would have to think
18   about and he thought you probably would want to
19   call and talk to him about it.  So I don't
20   whether you do or not, but it would only be
21   relevant if you found that, in spite of the
22   nature of this crime, the inmate should be
23   deemed eligible for parole.  But we feel that
24   under *Danenberg* and based on the participation
25   of this inmate in this grievous offense that
26   resulted in the death of a totally innocent and
27   unsuspecting victim that parole should be denied

59

1  for yet another year at this point.  Thank you

2  very much, and that's only nine minutes.

3      **PRESIDING COMMISSIONER SAWYER:**  Thank

4  you, Mr. Waddell.

5      **DEPUTY COMMISSIONER ROTHLISBERGER:**  We

6  need to take a break.

7      **PRESIDING COMMISSIONER SAWYER:**  We're

8  going to take a break and change a battery in

9  the audio equipment.

10               (Off record)

11  Okay, we took about a minute recess to change a

12  battery in the auto equipment.  Ms. Tardiff.

13      **ATTORNEY TARDIFF:**  Thank you.  We are

14  here to determine whether or not Mr. Parker

15  poses a risk of danger to society should he be

16  released.  We are not here to retry his case or

17  to figure out what matrix to be used; that's not

18  my job.  So as the District Attorney's Office in

19  many of the counties often like to refer to, I

20  certainly cannot second-guess the jury verdict

21  and they did not -- they must have seen

22  something at the time of the trial in Mr. Parker

23  as apposed to his brother, who we don't have

24  before us, to make them find Mr. Parker culpable

25  of robbery, kidnap and not the murder.  And I

26  think that we probably saw here today, from

27  Mr. Parker's actions, what sort of individual he

```
1    is.  We can't see the way his brother acts, but
2    I would imagine it's drastically different.
3    Also, his programming as opposed to his
4    brother's who got the murder conviction, who is
5    obviously not programming at all and is in and
6    out of being locked down and spending time doing
7    SHU terms.  So I certainly can't second-guess
8    the jury's verdict and the conviction he
9    received.  Just a couple of comments about what
10   the district attorney said in terms of the
11   commitment offense.  I don't think that
12   Mr. Parker selected this victim; his brother
13   selected the victim.  He agrees that he made the
14   choice and he's not trying to shirk his
15   responsibility, but I do think it's pretty
16   obvious that he -- particularly if you look at
17   his programming and no 115s and no prior
18   criminal history, his brother had served time in
19   prison before for kidnapping and robbery and
20   obviously there's references in the reports made
21   at the time of the -- after the crime that his
22   brother was known in the Oakland community as
23   being a, you know, a real bad dude and this and
24   that.  So, you know, you've kind of got that
25   situation going on.  I don't think, I think this
26   could have occurred even if my client had not
27   participated.  The district attorney feels or
```

61

1    thinks that but for his participation it
2    wouldn't have happened. I don't think that's
3    necessarily true. I think if he had told his
4    brother forget it that it still might have
5    happened. He knew the route, he knew how the
6    guy operated, he went his brother -- he went
7    with my client to work, to work out at the Naval
8    Station there. So I say mitigating factors are:
9    first of all, he had no prior criminal history,
10   and I think that he was swayed by his brother.
11   I'm not diminishing his responsibility, and this
12   was horrible what happened to this victim,
13   absolutely horrible, he must have been
14   terrified, and I'm not trying to diminish that
15   at all either. But the facts of the matter is
16   would this happen again, would Mr. Parker go out
17   and commit another crime? I found it extremely
18   unlikely that he would and that he posses any
19   degree of risk. There are no risk factors.
20   There is no substance abuse. His social history
21   before the commitment offense was stable; his
22   social history currently is stable; no crime
23   before; no 115s after; he's good worker. I mean
24   I'm not even going to go into the self-help,
25   because it's so numerous it would be ludicrous.
26   He's got this home inspection; he has meat
27   cutting; he has the parole plans; a timeline on

62

1   year by year what he's going to do; he's got
2   good family and community support. And just to
3   wrap it up here, his most recent psych
4   evaluation, which has been gone into, but what I
5   would like to add is that "his judgment was
6   intact, his insight and self-awareness were very
7   good and above average. He's used his time in
8   the institution in a commendable way. He has a
9   high GAF score of 90. He accepts full
10  responsibility for his involvement in the
11  commitment offense. It is event that his
12  brother was the leader and the main participant
13  in this offense. He is determined to live the
14  rest of his life helping others, living in a way
15  that benefits society and being a responsible
16  person. He has feelings of sorrow, and his
17  feelings of remorse appear to be sincere and
18  genuine." Again, there are no risk factors.
19  "No more of a risk to society than the average
20  citizen. In fact, due to his growth and
21  maturity over the years, he poses less risk to
22  society than the average citizen in the
23  community." And one of the reasons that I asked
24  him the question today, what would the Panel --
25  can they take that they know that you wouldn't
26  be influenced by someone else. I think the fact
27  that he hasn't received any 115s speaks in and

1   of itself that he obviously is his own man
2   today.  His '04 psych eval is also very
3   supportive, and that's where I got this from the
4   brother.  It says on the, it starts at the very
5   end of the first page, the last sentence:  "At
6   the same time inmate Parker indicated that he
7   always looked up to his older brother, as did
8   many people in the local Oakland community.  He
9   suggests that his brother was viewed positively
10  in Oakland as he was considered a dangerous
11  criminal.  It is obvious that inmate Parker is
12  truly sorry for this behavior.  It is fairly
13  clear --" and this is a different evaluator,
14  "from this evaluator's point of view that the
15  older brother was the leader in this entire
16  crime."  And he received a high GAF score of 85
17  and no Axis I or Axis II diagnosis.  "Drugs and
18  alcohol have never been an issue.  His threat of
19  violence in the community is appropriately
20  average when compared to the non-offender group
21  of a similar age."  And the 2000 is also
22  supportive:  "Prognosis is positive."  No I or
23  II Axis diagnosis; an 85 GAF score.  And it
24  says:  "In consideration of several factors, his
25  lack of any criminal history, his lack of any
26  115s, if released to the community no more than
27  the average citizen."  And, again, no

64

1    significant risk factors.  So, you know, I just
2    don't -- he's been incarcerated long enough for
3    what he was convicted of and for what the jury
4    thought he was guilty of.  To continue to
5    incarcerate him would be strictly punishment and
6    the bottom line, again, is he a risk or should
7    he be released?  And I simply cannot see where
8    he is any risk at this point in his life.  Thank
9    you.

10            **PRESIDING COMMISSIONER SAWYER:**  Thank
11   you, Ms. Tardiff.  Mr. Parker, this is your
12   opportunity to tell us why you feel you are
13   suitable for parole at this time.

14            **INMATE PARKER:**  Well, I wrote a -- I
15   actually typed a letter out and it was talking
16   about logical and reasonable thinking, but I
17   think I'm just going to speak from my heart.
18   Well, 14 years ago I committed a crime that was
19   terrible; I mean it was bad.  But through all my
20   time being incarcerated I have always tried to
21   do the right thing; even my whole life I done
22   the right thing.  It was just that I got caught
23   up and got influenced by an individual that I
24   truly cared about.  Well, I know I've got a lot
25   of insight to what I've done.  And when I hear
26   the district attorney talk about the crime and
27   how he feels, I feel he has a right to feel that

65

1    way, I mean the victim's family, excuse me,

2    Walter, Walter's family has a right to feel that

3    way.  I just feel that I've done -- that I have

4    great insight to what I've done and I've done a

5    lot of things to better prepare myself for the

6    street if released.  I understand what I've done

7    and I take full and complete responsibility and

8    I know it seems that at times I point a finger

9    towards my brother and I'm not trying to

10    minimize my culpability; I know what I done was

11    wrong and I take full and complete

12    responsibility.  I know that once I'm released

13    that I can be an asset to people out there

14    because of what I've learned.  The psych report

15    states that I'm lower than the average citizen,

16    and some might question that, but I believe that

17    I am.  And the reason why I believe that I am is

18    because I know where to go to know; I know what

19    could happen if a person gets in trouble.  See,

20    people on the street don't know that.  And I

21    won't to get there and I see on the news and I

22    constantly see violence and people not caring

23    about one another, and through my religious

24    belief I've learned that you've got to love, but

25    you also have to learn to forgive.  And once you

26    forgive yourself you start forgiving everyone

27    else.  And I pray that Walter's family can find

1   some sort of peace and forgiveness. And I'm
2   never going to stop dialoging and trying to
3   contact my brother and find out exactly where
4   Walter is so they can have closure. I just want
5   to let this Panel know that I know I'm ready.
6   I've prepared myself, I mean the record shows
7   that I've prepared myself. And before closing I
8   want to make one comment about what the district
9   attorney said and that was he talked about a
10  range of first or second-degree murder of the
11  new matrix. Well, kidnap, robbery doesn't have
12  a new matrix; kidnap, robbery has always been
13  the same. When Prop Seven came out, murder
14  changed from 15 to 25. If you read
15  Section 2282(b) it specifically talks about
16  going to that section of first-degree murder.
17  And assuming you're going to do what he says, I
18  take responsibility for my participation. My
19  actions possibly lead to the death of the victim
20  and I take responsibility for that. But
21  according that that matrix, like he said, 15
22  years is the maximum. And I just wanted to
23  clarify that. But I truly believe that I've
24  done the necessary things to be found suitable.
25  Thank you.

26      **PRESIDING COMMISSIONER SAWYER:** Very
27  good, thank you. It is six minutes past three

67

1    and we will recess for deliberations.

2                         R E C E S S

3                          --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

68

```
1           CALIFORNIA BOARD OF PAROLE HEARINGS
2                    D E C I S I O N
3           DEPUTY COMMISSIONER ROTHLISBERGER:
4   Where's the -- oh, where did he go?
5           PRESIDING COMMISSIONER SAWYER:  There he
6   is.  Jack, can you hear us?  Can you hear us?
7           DEPUTY COMMISSIONER ROTHLISBERGER:  Did
8   you hit mute?
9           PRESIDING COMMISSIONER SAWYER:  No.
10          DEPUTY DISTRICT ATTORNEY WADDELL:
11  Somebody pulled the plug out of here for a
12  minute.
13          PRESIDING COMMISSIONER SAWYER:  Okay, can
14  you hear us?
15          DEPUTY DISTRICT ATTORNEY WADDELL:  I can
16  hear you.
17          DEPUTY COMMISSIONER ROTHLISBERGER:  We
18  were getting worried.
19          PRESIDING COMMISSIONER SAWYER:  You went
20  blank.
21          DEPUTY COMMISSIONER ROTHLISBERGER:  A
22  senior moment.
23          DEPUTY DISTRICT ATTORNEY WADDELL:
24  Someone pulled the plug on me.
25          PRESIDING COMMISSIONER SAWYER:  Screen
26  saver, yeah.  Okay, the time is 3:23 in the
27  CLIFFORD PARKER J-43369  DECISION PAGE 1  6/8/06
```

69

1   afternoon in the matter of Mr. Parker, and

2   everyone has returned to the room and on video.

3   The Panel has reviewed all information received

4   from the public and relied on the following

5   circumstances in concluding that the prisoner is

6   not suitable for parole and would pose an

7   unreasonable risk of danger to society or a

8   threat to public safety if released from prison.

9   Mr. Parker, this is a very troubling case, very

10  troubling.  While no case is black and white --

11          **INMATE PARKER:**  Right.

12          **PRESIDING COMMISSIONER SAWYER:**  This case

13  is very interesting as to what went down and

14  your involvement in it.  We, obviously, are

15  denying you parole for a year on the facts of

16  the case.  And the case is so terrible and your

17  involvement in it.  And I think you've been

18  forthright with us and we certainly encourage

19  you to help the Wainwright family in any way

20  possible that you can from in here, where you're

21  brother is in another institution, through your

22  family as you said.  Well, we can never bring

23  closure to a death, but you can bring some peace

24  to the family of Mr. Walter Wainwright, who was

25  at the time 34 years old.  A couple of the

26  troubling areas that we had in this crime is the

27  **CLIFFORD PARKER J-43369  DECISION PAGE 2  6/8/06**

1  planning, and your relationship to

2  Mr. Wainwright prior to this. There is no

3  indication that Mr. Wainwright, certainly,

4  deserved to be robbed or kidnapped or disappear

5  from the face of this earth. You used your car.

6  The statement in the probation officer's report,

7  from the maintenance man that observed the

8  victim in the truck of your car with his mouth

9  duct-taped and his right arm appeared to be

10  bound behind his back, his left arm was free and

11  he was terror-stricken; I can't imagine. Just

12  being in the truck of a car terrifies me.

13         **INMATE PARKER:** Right.

14         **PRESIDING COMMISSIONER SAWYER:** Without

15  being bound and gagged and robbed. And "before

16  the maintenance man could come to the aid of

17  Mr. Wainwright, Parker ran out of the apartment

18  and slammed the truck on the victim's head. And

19  then he and another person then drove off." You

20  were found guilty of kidnap, robbery, 209(b) and

21  the additional robbery was the 211 crime, which

22  was stayed. You had a jury trial. And we just

23  feel that this is scary to us. It is scary to

24  us to make a decision to put you on the street

25  today because of your actions at the time,

26  leading up to and at the time of this commitment

27  CLIFFORD PARKER J-43369   DECISION PAGE 3   6/8/06

1    offense, okay. You seem like a great guy other

2    than that. Your programming is outstanding, and

3    I'll talk a little about that. You have no

4    history -- and that's what -- you see, we get

5    two different people here. You see what I'm

6    talking about?

7        **INMATE PARKER:** Absolutely.

8        **PRESIDING COMMISSIONER SAWYER:** Okay, we

9    got Dr. Jekyll and Mr. Hyde. We've got you

10   sitting here and you've got all this programming

11   and you've got all this support, you've got no

12   criminal history. What was going on other than

13   you were having trouble with your girlfriend and

14   your brother came to live with you?

15       **INMATE PARKER:** Right.

16       **PRESIDING COMMISSIONER SAWYER:** But you

17   were old enough, or you should have been old

18   enough at that point to know right from wrong.

19   You're brother is six years older than you, and

20   while you, again -- you're saying all the right

21   things, you know, you're not influenced by your

22   brother but you were, and you were kind of

23   running down the middle of that road, but that's

24   okay, I understand what you're trying to say; we

25   understand what you're trying to say.

26       **INMATE PARKER:** Right.

27   **CLIFFORD PARKER J-43369   DECISION PAGE 4   6/8/06**

72

1      **PRESIDING COMMISSIONER SAWYER:**  Yeah, our

2  siblings have some control over us, both young

3  and old.  Some are more aggressive and some are

4  less aggressive.  You seem like just a mellow

5  guy.  And it just does, it's just that the

6  commitment offense and how it turned out and all

7  things considered we just want to think about it

8  for another year, okay.  No criminal history,

9  not even a tumultuous time in your history, I

10  mean you had a good, from the sounds of it, a

11  good growing up and you were working.  We didn't

12  see any indication -- we couldn't see this

13  coming, you know, nobody could see this coming.

14  I'm sure you shocked a lot of people when this

15  went down.  They could see it coming with your

16  brother, but they couldn't see it coming with

17  you.  Recently, you -- well, while you've been

18  down there has been no 115s.  You've got three

19  years in the meat cutting now?

20      **INMATE PARKER:**  Yes.

21      **PRESIDING COMMISSIONER SAWYER:**  Three

22  years in the meat cutting, laudatory chronos,

23  everybody likes you.  You've got that nice

24  letter.  Hazmat, you've gone through the FEMA

25  courses, Business Principles, and most recently

26  the organization and it sounds like a great

27  CLIFFORD PARKER J-43369  DECISION PAGE 5  6/8/06

73

1    organization.  The A-I-G-A group is there for

2    you and they want you to help them.  Great

3    Truths of the Bible; Prison Fellowship; Home

4    Inspection Certificate; NA, AA from 1998; Self-

5    esteem group; Criminon [phonetic]; Personal

6    Integrity; Anger Management.  You're just doing

7    really well and you are benefiting, clearly,

8    because nobody can take any of that education

9    away from you.  We can take away your freedom

10   but we can't take that education away from you.

11   And what's really interesting is that we have

12   people come in here and say we can't get a self-

13   help group, right, counsel?

14        **ATTORNEY TARDIFF:**  That's true.

15        **PRESIDING COMMISSIONER SAWYER:**  They come

16   in -- what yard are you on?

17        **INMATE PARKER:**  Central.

18        **PRESIDING COMMISSIONER SAWYER:**  Central

19   yard.  You're going to make it tough on the next

20   guy, you know, you really are.  Psychiatric

21   factors, by Dr. Macomber, the most recent psych

22   is 5/26/2006 and it has you at a low risk,

23   according to Dr. Macomber.  Parole plans rarely

24   do I see better parole plans.  You've got your

25   mom and dad in Richmond; your fiancée in Union

26   City; truck driving job; working with your dad

27   **CLIFFORD PARKER J-43369   DECISION PAGE 6   6/8/06**

74

1  in building maintenance; the Bay Gee

2  Entrepreneur Enterprises; the Home Improvement

3  Certification, which could be a marketable

4  skill; certainly your meat cutting is going to

5  be a marketable skill.  They still have butcher

6  shops and, you know, they cut it and they put in

7  packages in most places now, but it has to be

8  cut, and they make pretty good money.

9         **INMATE PARKER:**  Right.

10        **PRESIDING COMMISSIONER SAWYER:**  We did

11 have a response from the Contra Costa County,

12 from Mr. Waddell, that is in opposition to your

13 parole as well as a letter in the confidential

14 file that's in opposition to your parole.

15        **DEPUTY COMMISSIONER ROTHLISBERGER:**  I'm

16 going to go ahead and switch the tape.

17        **PRESIDING COMMISSIONER SAWYER:**  Okay.

18             (TAPE 1, SIDE B, ENDS)

19             (TAPE 2, SIDE A, BEGINS)

20        **PRESIDING COMMISSIONER SAWYER:**  Again, I

21 want to commend you -- you've made it a

22 difficult decision for us, a very difficult

23 decision for us, because of the way you've

24 programmed, your discipline, your history, but

25 we are still not comfortable.  And if there is

26 anything you can do to help the family of the

27 CLIFFORD PARKER J-43369  DECISION PAGE 7  6/8/06

1    victim, Mr. Wainwright, who only lived for 34

2    years, if there is anything that you can do in

3    your power to help that family, I'm sure

4    everyone would be sympathetic to getting you out

5    of here, because you are taking up a lot of room

6    here.

7         **INMATE PARKER:** Uh huh.

8         **PRESIDING COMMISSIONER SAWYER:** And our

9    recommendations to you are:  remain disciplinary

10   free, of course, and you know how to do that;

11   continue to earn the positive chronos; and

12   continue your self-help as you've been doing.

13   And this is a -- and it's not intended to be,

14   but it is, in all reality this is a test, you

15   are continuously being tested here to make sure

16   that you're the real deal.  And you're demeanor

17   and your presentation today, sir, is

18   outstanding, outstanding.  It's hard for us to

19   give you another year, and we wrestled over it,

20   and I'm sure you understand the circumstances

21   and your culpability in this crime that more

22   than likely lead to the death of Mr. Wainwright.

23   Do you have anything you would like to say,

24   Commissioner?

25        **DEPUTY COMMISSIONER ROTHLISBERGER:**  I

26   just want to wish you all the best of luck and

27   **CLIFFORD PARKER J-43369  DECISION PAGE 8  6/8/06**

76

1   tell you to keep up all the excellent work.

2   Good luck to you, sir.

3        **INMATE PARKER:**  Thank you.

4        **PRESIDING COMMISSIONER SAWYER:**  Okay,

5   that concludes this Hearing.  It's 33 minutes

6   past 3:00 o'clock.  Thank you.

7        **DEPUTY DISTRICT ATTORNEY WADDELL:**  Thank

8   you.

9        **PRESIDING COMMISSIONER SAWYER:**  Good luck

10  to you, sir.

11                    --oOo--

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED ONE YEAR**            OCT 0 6 2006

24  **THIS DECISION WILL BE FINAL ON:**_____

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **CLIFFORD PARKER J-43369  DECISION PAGE 9  6/8/06**